## In re Claude RANCOURT, Debtor.

### Bankruptcy No. 90–11957.

United States Bankruptcy Court,
D. New Hampshire.

March 19, 1993.

Warren Agin, Barron & Stadfeld, P.C., Boston, MA, FDIC Rec'r for Merchants Nat. Bank.

Steven Ellis, Goodwin, Proctor & Hoar, Boston, MA, for Claude Rancourt, debtor.

Paul D. Moore, Choate, Hall & Stewart, Boston, MA for Steven Darr, trustee.

Edmond J. Ford, Ford & Ford, Portsmouth, NH, for Banc One (BankEast).

Robert M. Walsh, Hassan & Reardon, P.C., Boston, MA, for Creditor's Committee.

### MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This court had before it for hearing on March 9, 1993 a proposed sale of various manufactured housing mobile home parks in which the original offers presented by the trustee for hearing were by the various tenants' associations or affiliated government agencies acting for them and in which the trustee received counter-offers at higher amounts in certain instances but with differing terms and conditions as to closing and other contingencies. Also, none of the counter-offers, perhaps save one, had deposits. This opinion sets forth formally a bench ruling announced at the March 9, 1993 hearing.

The court conducted an extensive hearing asking for input from all parties involved to solve or help to solve the dilemma presented by a federal statute, 11 U.S.C. § 363(b)(1), that provides for a liquidation of bankruptcy estates by auction bidding processes or otherwise, that will extract the highest realizable value of the property, as opposed to state statutes, N.H. RSA 205–A:21 and Vt.Stat.Ann. 10 § 624, that generally provide that tenants of a mobile home park in either New Hampshire or Vermont are entitled to notice by the owner of a proposed sale and a sixty day period to react and presumably match the offer, or perhaps top it, but in any event possibly take the sale away from the original offeror. The state statutes also provide that even after the sixty days, the tenants still have a reasonable time to get financing to support their offer. The one thing that is clear to me is that under neither the federal nor the state statutes or constitutions do the tenants' associations, or the tenants individually, have a right to obtain the park for less than the market value of the property. The dilemma is how to implement these statutes as far as they can be fully implemented without destroying one or the other.

### I. THE STATE STATUTES

The New Hampshire statute provides in relevant part:

205–A:21 Notice Required Before Sale.

I. No manufactured housing park owner shall make a final unconditional acceptance of any offer for the sale or transfer of a manufactured housing park without first giving 60 days' notice to each tenant:

(a) That the owner intends to sell the manufactured housing park; and

(b) Of the price, terms and conditions of an acceptable offer he has received to sell the park or the price, terms and conditions for which he intends to sell the park. This notice shall include a copy of the written offer or other document which sets forth a description of the property to be purchased and the price, terms and conditions of the acceptable offer.

II. During the notice period required under paragraph I, the manufactured housing park owner shall consider any offer received from the tenants or a tenants' association, if any, and the owner shall negotiate in good faith with the tenants concerning a potential purchase. If during the notice period, the tenants decide to make an offer to purchase the manufactured housing park, such offer shall be evidenced by a purchase and sale agreement; however, the tenants shall have a reasonable time beyond the 60–day period, if necessary, to obtain financing for the purchase.

III. The notice required by paragraph I shall be served by certified mail, return receipt requested, to each tenant at his abode. A receipt from the United States Postal Service that is signed by an adult member of the household to which it was mailed, or a notation on the letter that the letter was refused by any adult member of the tenant household, or that the addressee no longer resides there, or

that the letter was returned to the post office unclaimed, shall constitute a conclusive presumption that service was made in any court action in this state.

The Vermont statute provides in relevant part:

§ 6242. Leaseholder's right to notification prior to park sale.

(a) A mobile home park owner shall give to each leaseholder and to the commissioner of the department of housing and community affairs notice by certified mail of his or her intention to sell the mobile home park. For the purpose of this section, a leaseholder is the holder of a lease for a lot or a leasehold on which a mobile home owned by the leaseholder is sited. The notice shall state the following:

(1) that the owner intends to sell the park;

(2) the price, terms and conditions under which the park owner offers the park for sale;

(3) a list of the affected leaseholders and the number of leaseholds held by each;

(4) the status of compliance with applicable statutes, regulations and permits, to the owner's best knowledge, and the reasons for any noncompliance; and

(5) that for 45 days following the notice the mobile home park owner shall not make a final unconditional acceptance of an offer to purchase the park and that if within the 45 days the park owner receives notice pursuant to subsection (c) of this section that a majority of the leaseholders intend to consider purchase of the park, the owner shall not make a final unconditional acceptance of an offer to purchase the park for an additional 90 days except one from a group representing a majority of the leaseholders or from a nonprofit corporation approved by a majority of the leaseholders.

(b) The leaseholders shall have 45 days following notice under subsection (a) of this section in which to determine whether they intend to consider purchase of the park through a group representing a majority of the leaseholders or a nonprofit corporation approved by a majority of the leaseholders. A majority of the leaseholders shall be determined by one vote per leasehold and no leaseholder shall have more than three votes or 30 percent of the aggregate park vote, whichever is less. During this 45–day period, the owner shall not accept a final unconditional offer to purchase the park. A park owner shall not restrict representatives of the department from access to the park residents.

(c) If the park owner receives no notice from the leaseholders during the 45–day period or if the leaseholders notify the park owner that they do not intend to consider purchase of the park, the park owner has no further restrictions regarding sale of the park pursuant to this section. If during the 45–day period, the park owner receives notice in writing that a majority of the leaseholders intend to consider purchase of the park then the park owner:

(1) shall not accept a final unconditional offer to purchase from a party other than leaseholders for 90 days following the notice from the leaseholders;

(2) shall negotiate in good faith with the group representing a majority of the leaseholders or a nonprofit corporation approved by a majority of the leaseholders concerning purchase of the park;

(3) shall consider any offer to purchase from a group representing a majority of the leaseholders or from a nonprofit corporation approved by a majority of the leaseholders;

(d) A park owner who sells a mobile home park without complying with this section shall be liable to the residents in the aggregate amount of $10,000 or 50 percent of the gain realized by the owner from the sale, whichever is greater.

(e) The provisions of this section do not apply when the sale, transfer or conveyance of the mobile home park is:

(1) through a foreclosure sale;

(2) to a member of the owner's family or to a trust for the sole benefit of members of the owner's family;

(3) among the partners who own the mobile home park;

(4) incidental to financing the park;

(5) between joint tenants or tenants in common;

(6) pursuant to eminent domain.

(f) No additional notice pursuant to subsection (a) of this section shall be required if the mobile home park owner completes a sale of the park within one year from the date of the notice.

(g) A majority of the leaseholders shall negotiate in good faith with the park owner for purchase of the park. —— Added 1987, No. 252 (Adj. Sess.), § 6, eff. Aug. 1, 1988; 1989, No. 229 (Adj. Sess.), § 10.

## II. DISCUSSION

■ As I explained in *Public Service Co. of New Hampshire,* 108 B.R. 854, 880–87 (Bankr.D.N.H.1989), it is the duty of federal courts presented with a preemption situation to try to accommodate the objectives of both the federal and state statutes by implementing each as far as that may be done. But if full implementation of the key provisions of the federal statute is prevented by full implementation of the state statute, then the state statute must yield under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI.

■ In the present case, the state statute does not have to yield except in one respect and that is whether the tenants have a right to take the property after an auction sale, which presumably will determine market value, for the same price that a competing high bidder offers at the auction sale.[1] In my judgment to enforce that claimed right destroys the federal statute and the auction bidding process. It certainly has a chilling effect upon that process as I pointed out in an analogous situation in *In re Mr. Grocer Inc.,* 77 B.R. 349, 353

(Bankr.D.N.H.1987). It does not do to say that the creditors will not be hurt because the tenants will be paying the same price as the high bid or even more. If they have the right, after the auction process is completed, to delay the process even further while they get financing and then take the property at the same price as that high bid (or possibly at a higher but delayed final bid) then that simply begs the question of whether you're going to "hit the mark" of the market value price in that kind of scenario. I do not think that you do.

■ The state statutes in my judgment contemplate the principal danger to the tenants to be remedied in this situation to be the situation where the park is sold "out from under them" without their having any say in that process. However, it does not guarantee them the right to buy the property for less than the market value of the property. If I were to fully enforce the state statutory provision with regard to the alleged "right of first refusal," as the special creditors' committee has argued the state statutes should be construed to provide, so that they can in effect take the property even after full and competitive auction bidding at the same price as another higher bidder after that process is over, that, in my judgment, destroys the efficacy of auction bidding.

Accordingly, it is my judgment that in this instance the state statute must yield by preemption to a limited extent. See *In re Public Service Co. of New Hampshire,* 108 B.R. at 885–867. In this particular case, the notice and motion for these sales were filed and circulated on January 20, 1993. This case was filed in October of 1990 and it has been no secret throughout this proceeding that the tenants wanted to acquire the properties and the trustee in fact has been negotiating with them and, as indicated, the initial offers here are from

---

**1.** It is true that the tenants also necessarily have to lose the right to hold off other offerors while they delay any sale for *another* sixty days while they secure financing for *their* final offer. It would be a curious auction however in which one bidder has a financing contingency not available or relevant to other bidders. Here to accommodate this problem as far as possible the trustee has been directed not to schedule the new sale hearing until such time as the tenants' associations, or any other interested bidders, can line up the necessary financing for the highest offers they may make.

the tenants at the values indicated. In effect the tenants' associations in these properties have had well over sixty days, or will certainly have that period by the time of the continued hearing on any sales here, to react to the situation and come up with their best offer. If that offer exceeds any other offer obviously it will be accepted. If it simply matches a high offer in that process it will not be accepted. I cannot do otherwise and still preserve the auction bidding process.

■ Nobody wants to come into an auction and bid property up as high as they can afford and then have it taken away from them at the same price. I cannot implement the state statute in that fashion without in effect destroying the federal statute in that regard. It is my view that if the tenants have at least sixty days to react, and in this case they have had years and certainly will have sixty days from the filing of the initial motion here to react to the auction process, then they should be able to "have their say" as to who gets this property which I think is at the heart of these state statutes. That is the key objective in my judgment.[2]

For all these reasons therefore the Court by separate Order will deny without prejudice approval of the counter-offers presented under the existing notice of intended sale. The trustee is directed to present for approval a form of order which will set for further hearing the offers by the tenants' associations, subject to an auction bidding process to consider any competing higher and better offers, in accordance with appropriate procedures such an auction set forth in my various bench rulings at the conclusion of the hearing on March 9, 1993.

---

**2.** The state statutes in question do not say that they can keep the property for less than the market value, but create procedures in which the tenants have their say and if they can pay the market price, then they can keep the property. That is the way the system works and that is the way the United States Constitution requires that property rights be handled under the takings clause of the Fifth Amendment to the U.S. Constitution in my judgment.